**UNITED STATES of America**

v.

**Salvatore A. LOMBARDI, Defendant.**

**No. 77 CR 659.**

United States District Court,
E. D. New York.

Sept. 4, 1981.

---

Edward R. Korman, U. S. Atty., E. D. N. Y. by Richard B. Appleby, Asst. U. S. Atty., Brooklyn, N. Y., for the U. S.

Gustave H. Newman, New York City, for defendant.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

On August 18, 1978, following three weeks of trial, a jury found defendant Salvatore Lombardi and three codefendants guilty of conspiracy to manufacture and possess methaqualone in violation of 21 U.S.C. § 846. The convictions were affirmed on appeal, *United States v. DiPalermo*, 606 F.2d 17 (2d Cir. 1979), and certiorari was denied, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980). Subsequently, defendant moved for a new trial pursuant to Rule 33, F.R.Crim.P., and 28 U.S.C. § 2255, claiming that he could present "newly discovered evidence." The Court granted a hearing on the motion and heard the argument of counsel. For the reasons indicated below, the application for a new trial is denied.

At trial, the government's evidence included the testimony of an informant who had been enlisted by co-defendant George Gillette in the spring of 1977 to assist in obtaining the chemicals Gillette's friend "Herman" desired in order to make methaqualone. "Herman," who was soon identified by the Drug Enforcement Administration (DEA) as defendant, had been experiencing difficulties establishing a manufacturing laboratory, but through the efforts of Gillette and co-defendant Joseph DiPalermo, a suitable facility was located in an isolated site on Ellis Street in Staten Island.

On the morning of October 31, 1977, agents of the DEA observed Gillette and the informant at a warehouse in New Jersey load a large quantity of chemicals in drums onto a yellow Ryder rental truck. They then drove the truck to Staten Island and parked it near defendant's home on Gower Street, Gillette explaining to the informant that it was being left there so that "Herman" could keep an eye on it. Shortly thereafter, the agents observed a man they identified at trial as defendant drive the truck directly towards the Ellis Street laboratory. At a certain point in its travels, however, the truck began to make "evasive maneuvers" and it eventually returned to Gower Street. Later that night the truck was observed at the Ellis Street site where the chemicals were unloaded and carried into the laboratory. Gillette told the informant that the successful delivery had been made by "Herman," and that they were concerned about possible surveillance by the DEA during the earlier attempted delivery.

Following his conviction and the failure of his direct appeals, defendant submitted to the Court the affidavit of his blood nephew George Lombardi, which stated that he, and not his uncle, had been the driver of the Ryder truck. George Lombardi later testified at the hearing on this motion that he had been asked by Gillette (who disappeared prior to sentence and is believed to be dead) to drive the Ryder truck on October 31, 1977, and that he was unaware of the contents of the barrels which he helped to unload from the truck. He further testified that he later returned to his uncle's house, where he had slept the night before, and spent part of the evening there at a family Halloween party attended by some thirty to forty people.

George Lombardi testified that over the past several years he has had legal and financial problems, as well as marital difficulties. Throughout this period, he received gifts of money from his uncle, and since the spring of 1977 has lived in a house in Margate, Florida, purchased for him as a favor by his uncle Salvatore.

George stated that he visited with his uncle several times after the latter's arrest. In addition, they saw each other during the three weeks of defendant's trial and discussed its progress. Throughout this period, George Lombardi testified that it did not occur to him—nor was he asked—to reveal any information that he might have had about the Ryder truck. It was not until after his uncle's imprisonment in the spring of 1980 that George came forward and contacted the United States Attorney's office and related his version of the events of October 31, 1977. It is this evidence that defendant wishes to present to a new jury at a second trial.

■ With regard to the standard for the granting of a motion for a new trial on a claim of newly discovered evidence, the Court of Appeals for this Circuit has recently reiterated

"our repeated instructions that such a motion 'should be granted only with great caution' and only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal. *United States v. Stofsky*, 537 [sic 527] F.2d 237, 243 (2d Cir. 1975), *cert. denied*, 429 U.S. 819 [97 S.Ct. 66, 50 L.Ed.2d 80] ... (1976); *United States v. Slutsky*, 514 F.2d 1222, 1225 (2d Cir. 1975); *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.), *cert. denied*, 357 U.S. 937 [78 S.Ct. 1385, 2 L.Ed.2d 1551] ... (1958)."

*United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980).

■ Reviewing these three factors, we note first that the Court of Appeals, in affirming defendant's conviction, commented that the DEA agents' identification of him as the driver of the truck was a significant piece of evidence linking him to the conspiracy. In light of this comment, and the fact that George Lombardi's testimony, if credible, would tend to be independent exculpatory evidence, we are constrained to conclude that the proffered testimony would be material and not cumulative.

The next required showing for a new trial, that the admission of the evidence would "probably" lead to an acquittal, presents a more difficult problem for defendant. The Court of Appeals assigned significance to the identification of defendant to support its affirmance of our conclusion at trial that there was sufficient nonhearsay evidence to justify the admission against defendant of the statements of his fellow conspirators. See *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Defendant now argues that George Lombardi's testimony would "nullify" that of the identifying agents and preclude the admission against him of co-conspirators' hearsay, which he further asserts would result in an acquittal.

■ We note, however, that the standard for connection to a conspiracy is lower than the standard of evidence sufficient to submit a charge of conspiracy to a jury, *United States v. Alvarez-Porras*, 643 F.2d 54, 57 (2d Cir. 1981); and may be met "by a fair preponderance" of the direct evidence. *United States v. Geaney, supra*, 417 F.2d at 1120. There was significant non-hearsay evidence of defendant's repeated contacts with other members of the conspiracy, as well as the use of his house as an apparent staging point for the transfer of the chemicals—even if their delivery had been made by George Lombardi.

Most importantly, however, we must be guided in this context by Judge Friendly's admonition that when assessing the sufficiency of direct evidence of connection to a conspiracy, "Judges are not required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977). At a new trial, the Court would have to weigh the credibility of the identifying agents against that of George Lombardi. We note that the agents' testimony at both the hearing and at the trial in 1978 was detailed, consistent and mutually corroborative. George Lombardi, on the other hand, displayed an

apparently selective memory and was tellingly vague with regard to details of actions that he now claims to have been his own.

■ On a motion of this sort, the Court must assess the credibility of testimony proffered to rebut that of a prosecution witness. *United States v. Bermudez*, 526 F.2d 89, 100–01 (2d Cir.), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). Moreover, in view of the Court of Appeals' repeated reaffirmations of Judge Friendly's admonition, see, *e. g., United States v. Alvarez-Porras, supra*, 643 F.2d at 58; *United States v. DiPalermo, supra*, 606 F.2d at 22; the Court would be unable to ignore George Lombardi's personal difficulties and his special relationship to his uncle in assessing whether his testimony could, as defendant asserts, "nullify" that of the DEA agents.[1] For these reasons, and because of the important interest of according finality to a jury's verdict, *United States v. Stofsky, supra*, 527 F.2d at 243, the Court is unable to say that George Lombardi's testimony would "probably" lead to an acquittal.

Finally—and most importantly—the motion for a new trial must be denied because defendant has wholly failed to show that the evidence could not with due diligence have been discovered before or during trial.

Defendant testified at the hearing that before trial he and his attorney became aware that he would be identified by the agents when the prosecutor made available various materials pursuant to 18 U.S.C. § 3500. At that time, defendant stated he told defense counsel that he had not driven the truck. He testified at the hearing that at no point from that moment until the end of the trial did he and his attorney discuss the truck or who may have been its driver.

Defendant stated that he was not even curious as to who might have driven the truck

"[b]ecause I never felt I could get convicted of this charge. I didn't give it much thought.

"I actually thought it was some kind of a joke, in a sense.

"Q. So, if I understand your testimony correctly, that wasn't one of your concerns as to who it really might have been?

"A. No, it wasn't."

Transcript of Hearing, January 8, 1981,[2] at 159. The attitude revealed in this testimony is remarkable in one who was a prior multiple offender having considerable experience with the criminal justice system.[3]

In addition to failing to ask his attorney to investigate the matter, defendant stated that at no point did it occur to him to ask any of the people—mostly members of his family, including his nephew George—who attended the party at his house on October 31, 1977, if they knew anything about the Ryder truck that was driven to and from and parked on Gower Street that day. Defendant admitted that several members of his family believe that he and his nephew George resemble each other, and acknowledged that he saw George on several occasions before and during the trial, but never thought of asking his nephew about the truck. In light of defendant's assertion that he was not the truck driver, and his concession that the identification was one of the most important pieces of evidence against him, T. 150, due diligence would require at the very least some effort to locate the person who drove the truck, if it was not defendant. See *United States v. Leyba*, 504 F.2d 441 (10th Cir. 1974), *cert. denied*, 420 U.S. 934, 95 S.Ct. 1139, 43 L.Ed.2d 408 (1975).

At trial, the government's evidence explored in detail the transportation of the

---

1. By the same token, the jury's right and obligation to assess the credibility of witnesses would bar any conclusion that after the admission of the co-conspirators' hearsay, a new jury would "probably" acquit defendant based upon the testimony of George Lombardi.

2. Hereinafter "T."

3. Counsel stipulated to the accuracy of defendant's prior criminal record as reflected in the presentence report prepared by the Probation Department. T. 148–49.

chemicals in the Ryder truck to the Ellis Street methaqualone laboratory. The prosecutor showed that George Gillette rented the truck, loaded it with the chemicals and drove it to Staten Island. In addition, the government's witnesses testified that on October 31, 1977, co-defendant William Romano followed the Ryder truck, in obvious concert with whoever was driving it, in the first attempt to make the delivery to the Ellis Street site. At the hearing, defendant stated that he had known and been friendly with both Gillette and Romano for years prior to the trial. Defendant was asked at the hearing:

"Q. When you heard that testimony [about Gillette and Romano and the Ryder truck], you were sitting near those two defendants at the trial; correct?

"A. Yes.

"Q. Did you even ask either George Gillette or William Romano, 'Who drove the Ryder rental truck'?

"A. No.

"Q. Were you curious to ask them?

"A. In a way. But I think it was none of my business.

"Q. And you think it might have helped you to ask them?

"A. I imagine it would have. If they would have answered me." T. 167–68.

In the light of all the foregoing, the Court is convinced that at several times before or during his trial the exercise of due diligence could have led to the discovery of the testimony upon which defendant now requests a second chance of acquittal.

Finally, defendant admitted that even after his nephew more recently came forward with 'his version of events, he made no effort to locate either Gillette or Romano, even though he thought they could corroborate George Lombardi's testimony. T. 169, 170. The following exchange occurred near the end of the hearing:

"Q. Is it fair to state, Mr. Lombardi, that ever since you were arrested, you really made no efforts at all to determine who was the one who drove the truck on October 31, 1977?

"A. Yes, it's fair to say that." T. 170.

Under these circumstances, the Court is of opinion that defendant has failed to satisfy his burden of showing that George Lombardi's testimony could not with due diligence have been discovered before or during trial.

Accordingly, the application for a new trial is denied.[4]

SO ORDERED.

---

4. Defendant seeks to bolster his arguments by showing that George Lombardi came with his revelation first to the United States Attorney, who did not notify defense counsel until several days later. It is true that a less exacting demonstration of materiality will be required where it can be shown that the prosecutor improperly withheld the evidence later discovered and made the basis of a new trial motion. *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). See *United States v. Provenzano*, 615 F.2d 37 (2d Cir.), *cert. denied*, 446

U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). However, this is only the case where the evidence is in the government's possession *before or during* trial and it is requested by the defense. *Id.* Here, defendant does not claim the United States Attorney knew of George Lombardi's testimony until he came forward, which occurred only after the Supreme Court denied certiorari. Nor does defendant suggest that the DEA agents knew that George Lombardi drove the truck and therefore offered perjured testimony. See *United States v. Stofsky, supra*, 527 F.2d at 245–46.